## ARMOUR & CO. v. CALLAHAN.

## In re FORSCH & CO.

Circuit Court of Appeals, Fourth Circuit.
April 10, 1928.

### No. 2679.

1. **Landlord and tenant** ⊕⇒76(2)—**Bankrupt's lease passed to trustee, who had power to sell it for benefit of estate.**

Bankrupt's lease of property, in existence at time of institution of bankruptcy proceedings, was asset which passed to trustee in bankruptcy with right to sell it for the benefit of the bankrupt estate, if it had any value, irrespective of conditions in lease against subletting.

2. **Bankruptcy** ⊕⇒140(½)—**Creditor may not, on eve of bankruptcy, take possession of asset of estate for his own benefit.**

Creditor of bankrupt corporation may not, on eve of bankruptcy, take possession of asset of the estate for his own benefit, and thereby virtually secure a part payment of his claim.

3. **Bankruptcy** ⊕⇒255—**Stockholder of bankrupt corporation, taking over lease forfeited by corporation, held entitled to rent only for period normally required for sale of bankrupt's assets, where final sale was delayed by stockholder's interference.**

Stockholder of bankrupt corporation, who allegedly procured forfeiture of corporation's lease, and then took the lease himself, held, not entitled to rent from bankrupt estate for entire period when premises were used pending litigation, but only to rent for such period as sale of assets would ordinarily have required had stockholder not interfered with the administration of the estate, where court set aside original sale of assets to stockholder and final sale was delayed by litigation due to the stockholder's interference.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Wheeling, in Bankruptcy; William E. Baker, Judge.

In the matter of Forsch & Co., bankrupt. Proceedings between Armour & Co. and Percy R. Callahan for the determination of the latter's claim against the estate for rent. From an adverse decision, Armour & Co. appeals. Modified and remanded.

Charles McCamic, of Wheeling, W. Va., (Jay T. McCamic, McCamic & Clarke, and James Morgan Clarke, all of Wheeling, W. Va., on the brief), for appellant.

John A. Howard, of Wheeling, W. Va. (Howard & Howard and W. C. Howard, all of Wheeling, W. Va., on the brief), for appellee.

Before WADDILL and PARKER, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. Forsch & Co., Inc., the bankrupt, was engaged in business as a retail dealer in meats and dairy products at the premises known as No. 122 East Market street, in the city of Wheeling, W. Va. It was the owner by assignment of a lease upon the premises for a term of five years, beginning May 1, 1924, and ending April 30, 1929, at the rate of $250 per month, payable on the 1st day of each month in advance with the privilege of an additional term of three years, at the monthly rental of $275. Extensive improvements were made upon the property by the bankrupt and its predecessor in title after the execution of the lease, whereby the building was practically rebuilt at an expense in excess of $33,000. Machinery and equipment were installed at an expense of nearly $13,000. The business was not successful, due in part to this large expenditure of money, and proceedings against the corporation were instituted in the circuit court of Ohio county, W. Va., wherein a receiver was appointed on October 27, 1923. The receiver took charge and thereafter conducted the business until it was closed on or about August 7, 1924.

P. R. Callahan, the appellee, became a stockholder of the company, to the amount of $1,000, a short time before the appointment of the receiver in the state court. Some time in February, 1924, there was a meeting of stockholders or directors of the company at its place of business, which later adjourned to meet in Callahan's office in Wheeling. The purpose of the meeting was to discover some way out of the company's financial difficulty. It was determined to raise $17,000 to purchase notes of the company held by a bank, and this was done; Callahan himself contributing $6,500. In addition he personally purchased claims of other creditors at the rate of 50 cents on the dollar, expending in this way between $1,500 and $2,000. It seems that Callahan was the leading spirit in these transactions, whereby he and his associates became possessed of the greater part of the indebtedness of the corporation. Certain shares of stock of the company were attached to the notes of $17,-000 as collateral. With the knowledge and consent of his associates, the collateral was sold and purchased by Callahan personally

25 F.(2d)—37½

for the sum of $900. By this means Callahan obtained control of a majority of the stock of the company.

The proceeding in bankruptcy was instituted on August 18, 1924. It became imminent in July, since the company was not able to meet its current expenses. It occurred to Callahan in the earlier month that he might make some money, and thereby recoup in part the money which he had advanced, by securing for himself the outstanding lease upon the premises and the machinery and equipment which had been installed at so great an expense. For this purpose he entered into an arrangement with the lessors of the building to secure a forfeiture of the company's lease in order that he might obtain a new lease for himself. The rent for the month of July had not then been paid, since the lessors had not customarily enforced the requirement of the lease that the rent be paid on the first day of the month in advance, but had allowed the lessee to pay it at any time during the current month. On or about July 31st, or August 1st, in accordance with the understanding with Callahan, the owners demanded the July rent, and were paid. The next day the owners returned and demanded the August rent, and, failing to collect it, declared that the lease was forfeited, notwithstanding their well settled prior practice to the contrary. The lease contained the stipulation that, if at any time during its continuance the lessee should fail to pay any installment of rent when due, the lessors should have the right to re-enter and possess the premises, and that the failure on the part of the lessors to collect the rent promptly when due should not be construed as a waiver by the lessors of prompt payment of subsequent rent, or as establishing a course of business between the parties. When the bankrupt failed to pay the August rent, the lessors did not exercise the right to a re-entry and possession of the premises, but contented themselves with a verbal declaration of forfeiture. In the meantime, Callahan had agreed to take and had prepared a lease of the premises in his own name, under date of August 1, 1924, for a period of 12 years and 9 months, at the monthly rental of $275 for the first 57 months, $300 for the next 36 months, and $325 for the next 60 months. After the failure of the company to pay the August rent on August 1st or 2d, the new lease to Callahan was promptly executed and delivered. The institution of bankruptcy proceedings was determined upon, and one week prior thereto a meeting of the stockholders was called and Callahan was elected presi-

dent of the company in order to be in a position to have official charge of its affairs during the course of the bankruptcy case. It has been noticed that at this time he not only owned the majority of the stock of the company, but owned or controlled a majority of the claims against it.

[1] If the bankrupt's lease of the property was in existence at the time that proceedings in bankruptcy were instituted, it is clear that the lease was an asset which passed to the trustee in bankruptcy, with the right to sell it for the benefit of the bankrupt estate, if it had any value, irrespective of any condition against subletting in the lease. Gazlay v. Williams, 210 U. S. 41, 28 S. Ct. 687, 52 L. Ed. 950; In re Prudential Lithograph Co. (C. C. A.) 270 F. 469.

[2] It is perfectly clear from the testimony that Callahan's actions during the month of July were intended to deprive the bankrupt estate of the opportunity to sell the lease for the benefit of creditors, and were therefore without lawful justification or excuse. It is contended, in his behalf, that he did not become an officer or director of the company until after the company's lease had been declared forfeited and the new lease to him had been executed, but there is little doubt that during the months of July and August, whatever may have been his nominal position, he was the holder of a majority of the stock of the company and in a position to exercise actual control over its affairs. Moreover, as a creditor of the company, he could not, on the eve of bankruptcy, lawfully take possession for his own benefit of an asset of the estate and thereby virtually secure a preferential part payment of his claim.

These facts were brought out in the examination of Callahan as president of the company at the creditors' meeting, whereupon the referee stated that he would instruct the trustee, who had then been elected, to take such steps as he might deem necessary to recover and reclaim the company's lease. The record in the case is somewhat confusing as to what the trustee actually did. He had secured an order from the referee under date of September 19, 1924, to sell the assets of the company, exclusive of the lease, but he was unable to make a sale. It was given out that the lease belonged to Callahan. Subsequently another sale of the assets, with the lease included, was advertised, to take place on the very day when the taking of testimony before the referee as to the facts concerning the lease was begun; but the sale was postponed. These transactions are not important for the decision of the case, except in so far as they may tend to throw value upon the lease. However, it is not possible to conclude that the trustee made a vigorous attempt to dispose of the lease, together with the other property, as an asset of the estate. On the contrary, notwithstanding the directions of the referee at the meeting of creditors, he took no steps to recover the lease from Callahan, but made a private sale to Callahan of all of the remaining assets of the estate, including machinery, equipment, accounts payable, etc., on December 11, 1924, and in the settlement recognized the validity of the Callahan lease by allowing Callahan a credit upon the purchase price of 5 months' rent of the premises at the rate of $275 per month. The machinery, equipment, etc., were sold for two-thirds and the accounts receivable for 50 per cent. of their appraised value. The moneys actually collected by Callahan on these accounts were largely in excess of the purchase price.

When the trustee filed his report of sale, Armour & Co., the appellant, objected to its confirmation, but after the taking of testimony, it was confirmed by the referee by order of January 5, 1925. Armour & Co. filed a petition for review on January 8, 1925, and also filed on February 17, 1925, a formal bill of complaint against Callahan, the trustee in bankruptcy, and the lessors of the property, praying in substance, that Callahan be declared to hold the lease as trustee for the bankrupt estate, and that the trustee in bankruptcy be removed from office. The answer of Callahan and other defendants was filed on May 5, 1925. The case seems to have been submitted to the court upon the evidence taken before the referee. The decision of the court was rendered on September 11, 1925, whereby the transaction by which it was attempted to forfeit the bankrupt's lease was declared to be in fraud of the rights of the bankrupt estate and therefore nugatory and void, and the new lease to Callahan to be of no effect so far as the bankrupt estate was concerned. The trustee was also removed from his office. On the same day an order of court was passed upon the petition for review of the referee's order whereby the order of the referee confirming the sale of the assets to Callahan was set aside. We think these orders were amply justified by the evidence before the court.

An appeal was taken by Callahan from this order, but it was not pressed (Callahan v. Armour [C. C. A.] 15 F.[2d] 1009), perhaps for the reason that he had succeeded in obtaining the property as well as the lease by subsequent proceedings in the District Court.

He filed a petition on October 2, 1925, in which he asked for the return of the purchase money paid by him for the property at the sale which had been set aside, and he claimed the sum of $2,750 for rent of the property from December, 1924, to October, 1925, while the case was pending in the lower court —that is to say, 10 months' rent at the rate of $275 per month. On the other hand, Armour & Co. took steps to secure the return from Callahan of the proceeds of the open accounts which he had collected in the interim.

While these proceedings were pending, a new trustee had been appointed and had secured an order to sell the property of the bankrupt, including the lease. He sold the lease and the remaining property other than the accounts receivable to Callahan on November 27, 1925, for the sum of $3.050. What charges should be made against Callahan and what credits should be given him in the settlement were considered by the referee. It is not necessary to go into the details, for the only question seriously disputed in this appeal is whether the referee was justified in allowing rent at the rate of $250 per month for the five months from August to December, 1924, preceding the first sale to Callahan, and also for nine additional months from January 1 to October 1, 1925. Callahan contends that the decision was right. Armour & Co., on the other hand, say that none of this rent should be allowed.

The District Court, by order of June 4, 1927, affirmed the referee, and expressly found that the acts of Callahan, in taking a lease of the premises, in purchasing the assets of the bankrupt at the first sale, in purchasing the assets of the bankrupt at the second sale, and his conduct in the case were not wrongful or fraudulent. So far as the record discloses, nothing new had been brought to the attention of the court since its orders of September 11, 1925, whereby the lease to Callahan, as well as the sale by the trustee to Callahan in 1924, were set aside as fraudulent, except the fact that upon the resale of the property in November, 1925, the trustee had been unable to secure any appreciable sum for the lease. Bearing in mind that a period of sixteen months had elapsed since the bankrupt had ceased to do business, during which the premises had been closed, it is not altogether clear that the lease had no value when bankruptcy proceedings were instituted. It is conceded that both Callahan and the attorney for the trustee then believed it to be valuable. The finding of the court in June, 1927, that Callahan was free of all wrongdoing in 1924 does not seem to us entirely free from doubt.

[3] However this may be, Callahan should not be allowed to collect from the bankrupt estate the rent during the entire period while the litigation was in progress. The former decree of the court, by which it was declared that the lease secured by Callahan was null and void, and that the bankrupt's lease was extant, is still outstanding and has never been reversed. Moreover, Callahan acceded to the decision by dismissing his appeal in the Circuit Court of Appeals and by purchasing the lease from the new trustee in bankruptcy. He has therefore acknowledged that he had no right to the premises during the period for which he claims rent. It is true that the trustee had some use of them for the storage of the property and that Callahan paid the rent. But this situation was brought about by Callahan's effort, subsequently abandoned, to sustain his lease and his first purchase of the property. The bankrupt estate received no benefit whatsoever from the long delay occasioned by the litigation. We therefore think that it would be inequitable to permit Callahan to collect the rent for fifteen months. However, a portion of the rent may properly be allowed. Some period between the institution of the bankruptcy case and the disposition of the assets of the bankrupt would necessarily have elapsed in any event, during which rent of the premises would have had to be paid by the estate. We think that the order of the court should be modified so that Callahan may be allowed rent for such period only as the District Court may find the sale of the assets of the bankrupt would ordinarily have required had Callahan not interfered with the administration of the estate. The case will therefore be remanded for further proceedings in accordance herewith; the costs of this appeal to be equally divided between the parties.

Remanded.